# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 19-1938V

| | |
|---|---|
| HOLLY F. KAHLER, | Chief Special Master Corcoran |
| Petitioner, | Filed: March 27, 2024 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Jessica Olins, Maglio Christopher & Toale, PA, Seattle, WA,* for Petitioner.

*Camille Michelle Collett, U.S. Department of Justice, Washington, DC,* for Respondent.

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On December 20, 2019, Holly F. Kahler filed a Petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") caused by an influenza ("flu") vaccine administered on October 4, 2018. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the reasons described below I find that Petitioner is entitled to compensation, and I award **$70,000.00 for Petitioner's actual pain and suffering, plus $438.90 for past unreimbursed expenses, for a total of $70,438.90**.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I.    Relevant Procedural History

Shortly after the claim's initiation, Petitioner filed medical records and a statement of completion. ECF Nos. 6-7. On May 28, 2020, Respondent filed a status report stating that a preliminary review of the case did not identify any missing records or issues that required further support. ECF No. 14. While this case awaited medical review, Petitioner submitted additional medical records. ECF No. 15.

On March 30, 2021, Respondent filed a status report stating that medical review of the case was complete and inviting a settlement demand from Petitioner. ECF No. 24. But they were unable to resolve the matter, and so Respondent filed his Rule 4(c) report in defense of this case on August 29, 2022, arguing that Petitioner's pain was not limited to her left shoulder, and that another condition or abnormality (mononeuropathy of the wrist) is present that could explain Petitioner's post-vaccination condition. ECF No. 40. Petitioner was subsequently ordered to submit additional evidence to address these issues. ECF No. 41.

On February 9, 2023, Petitioner filed a status report stating that no additional medical records exist and responding to Respondent's arguments raised in his Rule 4(c) report. ECF No. 42. Petitioner also filed a letter from her treating neurologist and photographs in support of her claim. ECF Nos. 43-44. Petitioner thereafter filed a motion for a ruling on the record regarding entitlement and damages on April 21, 2023. Petitioner's Motion for Ruling on Entitlement and Damages ("Mot."), ECF No. 45. Petitioner argued that she meets the Table definition of a SIRVA and requested an award of "no less than $75,000.00 for actual pain and suffering," and $438.90 in past unreimbursed expenses (consisting of $245.89 in out-of-pocket expenses and $193.01 in mileage), for a total of $75,438.90.[3] *Id.* at 18-22, 27, 36.

Respondent filed his response on June 1, 2023. Respondent's Response to Petitioner's Motion for a Ruling on Entitlement and Damages ("Response"), ECF No. 46. Respondent reiterated the arguments made in his Rule 4(c) report and argued that Petitioner should be awarded $45,500.00 for pain and suffering, $245.89 for past out-of-pocket expenses, and $68.70 for mileage, for a total of $45,814.59. Response at 12.

Petitioner filed a reply on June 8, 2023, addressing Respondent's arguments regarding entitlement and damages. Petitioner's Reply to Respondent's Response to Petitioner's Motion for a Ruling on Entitlement and Damages ("Reply"), ECF No. 48. Along

---

[3] Petitioner appears to have originally inadvertently requested a total award of "$75,439.90." *See,* e.g., Mot. at 36. However, in her reply, Petitioner requests the correct amount, totaling $75,438.90 ($75,000 in pain and suffering + $245.89 in out-of-pocket expenses + $193.01 in mileage = $75,438.90). Reply at 19.

with her reply, Petitioner filed medical literature. ECF No. 49. This matter is now ripe for resolution.

## II.    Petitioner's Medical History

Petitioner's pre-vaccination medical history was non-contributory. She was working as a school secretary at the time of the subject vaccination. *See,* e.g., Mot. at 6. At age forty-one, Petitioner received a flu vaccine on October 4, 2018, in her left shoulder. Ex. 1 at 2.

Approximately six weeks post vaccination, on November 14, 2018, Petitioner called the facility that had administered the subject vaccination, reporting that she "[h]ad [a] flu vaccine [on] 10/3/18[4] [sic]" and "[s]ince then, she has pain to the shot area." Ex. 2 at 107. Petitioner described the pain as a "sharp stabbing pain" when exercising or reaching and as a "dull ache" when typing. *Id.* Petitioner also noted that her pain "radiat[es] down [the] entire left arm into [her] hand." *Id.* at 108. She stated that the "[p]ain is very isolated to the site where the vaccine was given" but "[a]t times, she feels her left hand is weaker than usual and has tingling but not consistent." *Id.* at 107. Petitioner also reported numbness in her hands or fingers. *Id.*

Later that same day, Petitioner presented to the same facility where she received the subject vaccination. Ex. 2 at 99. Petitioner reported that her left arm pain "ha[d] been present for 1 month. Since [her] flu shot on 10/04/2018." *Id.* The location of the pain was noted as the "injection site" and was described as constant, "sharp, achy, and burning." *Id.* Petitioner also described "some weakness and radiating pain into [her left] hand." *Id.* The physician noted that Petitioner had no "previous arm problems." *Id.* Upon examination, Petitioner exhibited "[p]ain to palpation on [her] left mid-deltoid," and full strength and range of motion ("ROM"). *Id.* at 101. Petitioner was diagnosed with a left shoulder injury, and the physician opined it "seem[ed] consistent with [SIRVA]" that "[a]ppears to have [a] component of nerve[-]based pain." *Id.* The physician prescribed lidocaine cream and gabapentin, instructed Petitioner on a home exercise plan ("HEP"), and referred her to physical therapy ("PT"). *Id.*

Petitioner obtained an initial PT evaluation on December 11, 2018. Ex. 2 at 113. She reported her pain had been present and worsening since her October 4, 2018 vaccination. *Id.* She noted that her pain was interfering with reaching overhead, lifting, and her ability to sleep – but that with ibuprofen and a heat pack she was able to participate in self-care and activities of daily life ("ADLs"). *Id.* at 113-14. On examination,

---

[4] Although Petitioner reported that she received the subject flu vaccination on October 3, 2018, I find this was likely an error, as the date of the vaccination was one day later, on October 4, 2018.

Petitioner showed restricted strength and ROM and pain with palpation over the deltoid and subdeltoid bursa. *Id.* at 115. The physical therapist felt that Petitioner's symptoms were consistent with left shoulder pain and subdeltoid bursitis and she recommended additional PT to "improve her functional mobility." *Id.* at 117. Petitioner attested that during this visit, she was "in too much pain and discomfort to attempt any arm exercise." Ex. 4 ¶ 12.

On December 13, 2018, Petitioner presented to a sports medicine specialist reporting ongoing left shoulder pain "following a flu shot on 10/4/18." Ex. 2 at 122. Petitioner also noted "radiation down the lateral and front of the arm[ w]ith sensation of weakness" and a "tingling sensation in the fingers." *Id.* The physician noted that Petitioner did not have a history of "previous shoulder problems." *Id.* Petitioner rated her pain at a "5/10 at rest, but [stated it] can get up to a 9/10." *Id.* at 130. A physical examination revealed "abnormal" ROM, positive impingement tests, and tenderness to palpation over the bicipital groove, inferior to the acromioclavicular ("AC") joint, trapezius, posterior joint line, anterior deltoid, and "lateral pecs." *Id.* at 124.

Petitioner was diagnosed with left shoulder impingement syndrome and subacromial bursitis. Ex. 2 at 125. The "underlying cause" was listed as Petitioner's flu shot but the physician opined Petitioner's shoulder pain was also consistent with "nerve irritation." *Id.* Petitioner underwent "dynamic cupping" of her left shoulder and experienced "50% improvement." *Id.* Petitioner also received additional exercises for her HEP. *Id.* Petitioner attested that the cupping treatment was "very painful" and "felt like [she] almost passed out." Ex. 4 ¶ 13. It also left severe bruising that lasted several weeks. *Id.*

Petitioner presented for her second and final PT session on December 17, 2018. Ex. 2 at 130. She reported that she had seen a sports medicine specialist who "d[id] not believe [her injury was] SIRVA, but probably a subdeltoid bursitis." *Id.* Petitioner rated her pain at a 7-8/10 at rest. *Id.* The physical therapist recommended additional PT (at least six sessions) and opined that Petitioner had the "potential to achieve all discharge goals" with rehabilitations services. *Id.* at 133-34. The therapist also stated that PT was "medically necessary, reasonable, and appropriate for [Petitioner's] diagnosis." *Id.* at 134. Petitioner attested that her physical therapist told her "there was not much else he could offer [her]," so he recommended she speak with her doctor. Ex. 4 ¶ 14.

The next day, on December 18, 2018, Petitioner emailed her primary care physician ("PCP") reporting complaints of ongoing left shoulder pain "since [her] flu shot on 10/3/18[.]" Ex. 2 at 136. Petitioner's PCP stated that there was "[n]ot much to do about SIRVA" because it "[h]eals on [its] own." *Id.* Petitioner requested additional treatment options and was told to use NSAIDs, ice, and heat. *Id.*

On January 17, 2019, Petitioner went to her PCP with a chief complaint of "injury from [a] flu shot" in October 2018. Ex. 2 at 139. Petitioner stated she experienced difficulty sleeping and was continuing her HEP. *Id.* Upon examination, Petitioner had positive cross arm and Hawkins tests and pain with ROM. *Id.* at 140. Her PCP opined that Petitioner's shoulder pain "is most consistent with subacromial bursitis . . . [with the u]nderlying cause [as her] flu shot, muscular imbalance with tightness of the scapular stabilizers and the anterior pectoralis muscles, [and] nerve irritation." *Id.* at 139. Petitioner was prescribed cyclobenzaprine for her pain at night, ordered to obtain an MRI, and referred to an orthopedist. *Id.* at 141. Petitioner subsequently scheduled the MRI but cancelled it and did not reschedule at that time. *Id.* at 144.

In her affidavit, Petitioner attests that during her January 17, 2019 appointment with her PCP, she was told that her left shoulder injury "may take up to six months or longer . . . to recover." Ex. 4 ¶ 17. She explained that "[t]he impression [she] received from [her PCP] is that there is no treatment for SIRVA except that [she] would get better with time." *Id.* Petitioner felt "[t]his seemed accurate because [her] left shoulder had not improved despite [her] cupping treatment, [PT], and prescription medicine." *Id.* She also was told by her physical therapist that "there was not much else that [PT] could provide" and "[a]s such, it seemed unnecessary for [her] to meet doctors regularly within a span of several weeks." *Id.*

Petitioner further attests that "[o]ver the next few months, [she] continued to perform [her HEP]" and she took ibuprofen "when the pain became unbearable[.]" Ex. 4 ¶ 18. But by April 2019, Petitioner contends that she "continued to experience sharp pain in [her] left shoulder, . . . felt weakness in [her] arm, and a tingling and numbness sensation in [her] left hand." *Id.* ¶ 19. She noted difficulties with ADLs, including with washing her hair, driving, and sleeping. *Id.*

Despite Petitioner's assertions regarding her pain in April 2019, on April 17, 2019, Petitioner emailed her PCP's office requesting her vaccination record from October 4, 2018, only. Ex. 2 at 146. She did not mention any left shoulder complaints or the condition of her left shoulder in this correspondence. *See id.*

On August 1, 2019, approximately seven months from her last visit for left shoulder pain (on January 17, 2019), Petitioner presented to her PCP's office for ongoing left shoulder pain that was "constant and severe," worse with movement, and that "radiates to the top of the shoulder." Ex. 3 at 13. The physician noted Petitioner had "chronic numbness and weakness down the arm." *Id.* Upon examination, Petitioner exhibited decreased ROM with internal rotation and tenderness to palpation but full strength. *Id.* at

15. An x-ray was normal. *Id.* at 22. Petitioner was diagnosed with chronic left shoulder pain and an MRI was ordered. *Id.* at 15. Petitioner declined additional PT. *Id.*

Petitioner's August 19, 2019 MRI of the left shoulder revealed "[m]ild supraspinatus and subscapularis tendinosis, with bursal sided fraying of the supraspinatus tendon and a probable small partial thickness tear of the cranial fibers of the subscapularis tendon" and mild subacromial/subdeltoid bursitis. Ex. 3 at 23-24.

On August 23, 2019, Petitioner saw an orthopedist, reporting that her symptoms had been ongoing "since 10/2018" and "began with a flu shot." Ex. 6 at 1. An examination revealed "pain down the upper extremity . . . diffuse tenderness to palpation throughout the shoulder," a positive Neer's test, and "pain and some giving away with supraspinatus testing." *Id.* at 2. The orthopedist reviewed Petitioner's MRI and opined that Petitioner did "have some mechanical findings on her exam consistent with cuff impingement," but noted that post-vaccination pain "would be inconsistent with . . . impingement." *Id.* at 3. He noted potential treatment with a shoulder arthroscopy and subacromial decompression and debridement. *Id.* The orthopedist also noted he was not familiar with SIRVA and referred Petitioner to a physiatrist. *Id.*

Between October 16, 2019, and January 29, 2020, Petitioner went to her dermatologist and PCP for skin concerns and a sinus infection, respectively, but did not mention left shoulder complaints or receive treatment for left shoulder issues at either of these visits. Ex. 5 at 11-16; Ex. 8 at 7-18.

Petitioner had her annual physical with a new PCP on February 11, 2020. Ex. 8 at 25. Petitioner reported at this time that she "had a vaccine injury after her flu shot in the left shoulder, the vaccine was October 2018. She was diagnosed with SIRVA." *Id.* Despite PT and gabapentin, "she has continued numbness and tingling in her hand[.]" *Id.* Petitioner's diagnoses included chronic left shoulder pain and her PCP noted that she "continued to have a lot of neurologic symptoms into the left hand." *Id.* at 30. No other treatment was recommended for these symptoms. *See id.*

Throughout the following months (including in February and May 2020), Petitioner regularly saw her podiatrist, gynecologist, and dermatologist for unrelated conditions. *See,* e.g., Ex. 8 at 34-77, 84-85. Petitioner did not mention left shoulder symptoms during her visits to specialists during this time. *See id.*

Petitioner emailed her PCP on June 29, 2020, reporting ongoing shoulder pain. Ex. 9 at 5-6. Specifically, Petitioner noted that she had toe surgery on May 19, 2020, and that her use of crutches had "caused [her] shoulder to be in a lot of pain." *Id.* Petitioner

also noted ongoing difficulties sleeping. *Id.* At Petitioner's request, her PCP referred her to a neurologist/nerve specialist. *Id.*

Approximately one month later, on July 31, 2020, Petitioner had a tele-health visit with a neurologist. Ex. 9 at 25. Petitioner complained of ongoing left shoulder pain since her flu shot in October 2018. *Id.* She stated that she felt radiating pain in the upper arm "instantly" and "in the next 24 hours, [it] felt like her whole arm was in pain. Hand started throbbing." *Id.* Petitioner reported that she "[n]ow [] has chronic pain every day [and] . . . numbness and weakness when she wakes up[.]" *Id.* Petitioner specified the pain is "localized in her shoulder, but [is] also radiating [] down her arm." *Id.* at 24. She also reported tingling and weakness in both arms. *Id.* at 25. Following a physical examination,[5] showing, in relevant part, Petitioner was able to lift both arms above her head, the neurologist opined that "[a]lthough [Petitioner had] SIRVA symptoms due to inflammation at the joint, her description of radiating pain and weakness in her left hand raise[d] suspicion for peripheral mononeuropathy, less likely plexopathy." *Id.* at 24, 28.

Petitioner underwent an EMG on January 11, 2021. Ex. 10 at 13-15. The EMG revealed evidence for mild median mononeuropathy at the left *wrist*. *Id.* (emphasis added). While the EMG showed mononeuropathy, Petitioner's neurologist did "not suspect that [this condition] was the cause of [Petitioner's] left shoulder pain." *Id.* at 15. No additional medical records have been filed.

Petitioner submitted a brief, three paragraph letter from her neurologist on February 14, 2023. Ex. 16. The neurologist noted that she saw Petitioner on July 31, 2020, and January 11, 2021 (for the EMG), only. *Id.* at 2. The neurologist wrote that Petitioner's EMG showed a "mild left median mononeuropathy at the wrist (carpal tunnel syndrome) and there was no evidence of a brachial plexopathy." *Id.* In light of these findings, the neurologist stated she "would not expect a vaccination in the shoulder to cause a compressive neuropathy in the wrist." *Id.* The neurologist continued that such findings "do not refute or confirm SRIVA [sic], which is not a neurological disease." *Id.*

Petitioner's affidavit, authored on October 21, 2019, describes the limitations with ADLs she experienced. For example, in her position as a secretary at a school, she can no longer deliver supplies to other secretaries like she typically would pre vaccination. Ex. 4 ¶ 22. She also explained that can no longer pack snacks and carry coolers to her children's sports tournaments and that her children now help her with yard work. *Id.* ¶ 23.

---

[5] This examination appears to have been a modified examination, as it was performed during a tele-health visit.

Further, Petitioner had to change the way she walks her dog, and she cannot enjoy her pre-vaccination hobby of making earrings. *Id.* ¶¶ 24-25.

### III.   Legal Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[6] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

Section 11(c)(1) also contains requirements concerning the type of vaccination received and where it was administered, the duration or significance of the injury, and the lack of any other award or settlement. *See* Section 11(c)(1)(A), (B), (D), and (E). With regard to duration, a petitioner must establish that he suffered the residual effects or complications of such illness, disability, injury, or condition for more than six months after the administration of the vaccine. Section 11(c)(1)(D).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

---

[6] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury.  *See* § 11(c)(1)(A)(B)(D)(E).

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may

be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs*., 110 Fed. Cl. 184, 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## IV.   Factual Findings and Ruling on Entitlement

### A.  Factual Findings Regarding a Table SIRVA

After a review of the entire record, I find that a preponderance of the evidence demonstrates that Petitioner has satisfied the QAI requirements for a Table SIRVA.

#### 1.  Petitioner Has No Prior Left Shoulder Condition or Injury

The first requirement for a Table SIRVA is a lack of problems associated with the affected shoulder prior to vaccination that would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i). Respondent has not contested that Petitioner meets this criterion, and there is nothing in the filed evidence to suggest otherwise. I therefore find Petitioner has satisfied this Table criterion.

#### 2.  Onset of Petitioner's Injury Occurred within 48 Hours of her Vaccination

The second requirement for a Table SIRVA is that the onset of shoulder pain began within 48 hours of the subject vaccination. 42 C.F.R. § 100.3(c)(10)(ii). Respondent has not disputed, nor does the record refute, that Petitioner meets this criterion. I find Petitioner has thus met this criterion.

#### 3.  Petitioner's Pain was Limited to her Left Shoulder

The third QAI requirement for a Table SIRVA requires a petitioner's pain and reduced range of motion to be "limited to the shoulder in which the intramuscular vaccine was administered." 42 C.F.R. § 100.3(c)(10)(iii).

Respondent contests Petitioner's satisfaction of this element. Response at 10. In particular, he argues that Petitioner "consistently reported additional symptoms in her hand and down her arm throughout the course of treatment." *Id.* (citing Ex. 2 at 99, 107-08 (the November 14, 2018 phone call/visit and report to Petitioner's PCP stating that although her pain was "very isolated" to her shoulder, it radiated down her arm with tingling and weakness in the hand)). Respondent further noted that throughout Petitioner's treatment course, in addition to her reports of left shoulder pain, she continuously reported tingling, numbness, and weakness in the left arm, and throbbing in her left hand. *See,* e.g., *id.* (citing Ex. 2 at 122; Ex. 3 at 13; Ex. 8 at 25; Ex. 9 at 25).

But I find that there is a preponderance of evidence that Petitioner's pain was limited to her left shoulder. First, Petitioner's records consistently report left shoulder pain and loss of ROM, which are consistent with other SIRVA cases. Petitioner's diagnostic procedures were also limited to her left shoulder, and she received treatment for left shoulder pain. *See,* e.g., Ex. 2 at 99, 101, 107, 113, 117, 122-24, 130, 139-41; Ex. 3 at 23-24; Ex. 6 at 1-2; Ex. 9 at 25; Ex. 10 at 13-15.

Second, although there are references to pain radiating down Petitioner's left arm in some records, the majority of other records support a finding that Petitioner's pain was limited to her left shoulder and, more so, originated from the shoulder. *See,* e.g., Ex. 2 at 107 (a November 14, 2018 note stating Petitioner's pain was "very isolated to the site where the vaccine was given"); Ex. 9 at 24 (a July 31, 2020 note stating "pain is localized in her shoulder, but [is] also radiating [] down her arm"). In the Program, special masters have found that claims involving musculoskeletal pain *primarily* occurring in the shoulder are valid under the Table even if there are additional allegations of pain extending to adjacent parts of the body. *K.P. v. Sec'y of Health & Hum. Servs.*, No. 19-65V, 2022 WL 3226776, at *8 (Fed. Cl. Spec. Mstr. May 25, 2022) (holding that "claims involving musculoskeletal pain primarily occurring in the shoulder are valid under the Table even if there are additional allegations of pain extending to adjacent parts of the body").

Indeed, the gravamen of the third QAI criterion is intended to "guard against compensating claims involving patterns of pain or reduced [ROM] indicative of a contributing etiology beyond the confines of a musculoskeletal injury to the affected shoulder." *Grossmann v. Sec'y of Health & Hum. Servs.,* No. 18-0013V, 2022 WL 779666, at *15 (Fed. Cl. Spec. Mstr. Feb. 15, 2022); *Werning v. Sec'y of Health & Hum. Servs.*, No. 18-0267V, 2020 WL 5051154, at *10 (Fed. Cl. Spec. Mstr. July 27, 2020) (finding that a petitioner satisfied the third SIRVA QAI criterion where there was a complaint of radiating pain, but the petitioner was "diagnosed and treated solely for pain and limited

range of motion to her right shoulder"); *Cross v. Sec'y of Health & Hum. Servs*., No. 19-1958V, 2023 WL 120783, at *7 (Fed. Cl. Spec. Mstr. Jan. 6, 2023) (finding that "despite the notations of pain extending beyond the shoulder, Petitioner's injury is consistent with the definition of SIRVA and there is not preponderant evidence of another etiology").

Here, Petitioner in some isolated circumstances reported instances of pain extending beyond the shoulder, but her injury was otherwise consistent with SIRVA. *See Durham v. Sec'y of Health & Hum. Servs.,* No. 17-1899V, 2023 WL 3196229, at *11-13 (Fed. Cl. Spec. Mstr. Apr. 7, 2023) (finding "this is not a case where the medical records reflect that the symptoms beyond the confines of the shoulder are incidental to what was otherwise clearly treated as a shoulder injury," as the petitioner showed prominent symptoms of radiculopathy/numbness into the hand and neck, there ultimately was not any confirmed final diagnosis of a shoulder joint pathology, and a cervical etiology was deemed more likely by physicians). The evidence supporting a SIRVA can be distinguished from other incidental complaints of pain and neurological symptoms stemming from the shoulder into the wrist and hand (that ultimately received a separate diagnosis) – and those complaints can also be disregarded in determining damages. Petitioner has therefore established this QAI criterion.

### 4.  There is No Evidence of Another Condition or Abnormality

The last criterion for a Table SIRVA states that there must be no other condition or abnormality which would explain a petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv).

Respondent contends that Petitioner cannot meet this criterion because her EMG revealed mild median mononeuropathy of the left wrist. Response at 11 (citing Ex. 10 at 15). Further, Petitioner's neurologist felt that her complaints of radiating pain and hand weakness raised suspicion for a mononeuropathy, not SIRVA. *See id.* (citing Ex. 9 at 24). More so, Respondent relies on Petitioner's treaters concerns of nerve-based irritation to argue that she cannot meet this criterion. *Id.* (citing Ex. 2 at 101, 125; Ex. 8 at 30).

Respondent's argument, however, is at odds with his concession that Petitioner did not have a pre-vaccination history of left shoulder pain or injury. In fact, Petitioner's contemporaneous medical records state that Petitioner had no prior history of left shoulder complaints. *See,* e.g., Ex. 2 at 99 (a November 14, 2018 note stating Petitioner had "no previous arm problems"); Ex. 2 at 122 (a December 13, 2018 note stating no history of "previous shoulder problems").

Additionally, Respondent has failed to show that Petitioner's previously-asymptomatic mononeuropathy of the *left wrist* (not left shoulder) otherwise explains her post-vaccination condition to the exclusion of a SIRVA. *Grossman,* 2022 WL 779666, at *18; *Lang v. Sec'y of Health & Hum. Servs.,* No. 17-995V, 2020 WL 7873272, at *13 (Fed. Cl. Spec. Mstr. Dec. 11, 2020) (explaining that "findings consistent with impingement, rotator cuff tears, or AC arthritis do not *per se* preclude a finding that a Table SIRVA exists. Rather, the question raised by [R]espondent's argument is whether [a] petitioner's own clinical history indicates that her shoulder pathology wholly explains her symptoms independent of vaccination"). Indeed, Petitioner's treaters explicitly stated that her mononeuropathy at the left wrist was *not* responsible for her left shoulder pain. *See* Ex. 10 at 15.

Petitioner's clinical course is therefore consistent with onset of a SIRVA, more so than with any eventual manifestation of the chronic conditions apparent on diagnostic imaging, which were not specific to the left shoulder.

## B. Severity

While Petitioner has satisfied her burden under the QAI for a Table SIRVA, she also must demonstrate that she suffered "residual effects or complications of [the injury alleged] for more than six months after the administration of the vaccine," as required for eligibility under the Vaccine Program. Section 11(c)(1)(D)(i).

Because Petitioner received the flu vaccine on October 4, 2018, with immediate onset around that time, she must demonstrate by preponderant evidence that her residual symptoms continued for more than six months thereafter. *See,* e.g., *Herren v. Sec'y of Health & Hum. Servs.*, No. 13-100V, 2014 WL 3889070, at *2 (Fed. Cl. Spec. Mstr. July 18, 2014); *see also Hinnefeld v. Sec'y of Health & Hum. Servs.*, No. 11-328V, 2012 WL 1608839, at *4-5 (Fed. Cl. Spec. Mstr. Mar. 30, 2012) (dismissing case where medical history revealed that petitioner's Guillain-Barré syndrome resolved less than two months after onset).

Respondent does not dispute that Petitioner has satisfied the six-month severity requirement, and the record does not show otherwise. Thus, after consideration of the entire record, the evidence supports a finding that severity has been met. (Certainly, however, gaps in treatment underscore the extent to which this is a mild SIRVA that did not require surgery – and damages will take this into account).

## C. Other Requirements for Entitlement

13

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). Respondent does not dispute that Petitioner has satisfied these requirements in this case, and the overall record contains preponderant evidence to fulfill these additional requirements.

The record shows that Petitioner received a flu vaccine intramuscularly in her left shoulder on October 4, 2018, in Marysville, Washington. Ex. 4 ¶¶ 2-3; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for her injury. Ex. 4 ¶ 26; Section 11(c)(1)(E) (lack of prior civil award). As stated above, I have found that the onset of Petitioner's left shoulder pain was within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this requirement). This finding also satisfies the requirement that Petitioner's first symptom or manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(XIV)(B) (listing a time frame of 48 hours for a Table SIRVA following receipt of the influenza vaccine). Therefore, Petitioner has satisfied all requirements for a Table SIRVA. Additionally, as determined above, Petitioner has established the six-month severity requirement. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement).

Based upon all of the above, Petitioner has established that she suffered a Table SIRVA. Additionally, she has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

## V.   Damages

The parties have also briefed damages in this case, and the only components at issue are past pain and suffering, out-of-pocket expenses, and treatment-associated mileage. Petitioner requests no less than $75,000.00 for actual pain and suffering and $438.90 in unreimbursed expenses (including $245.89 in out-of-pocket expenses and $193.01 in mileage), for a total of $75,438.90. Mot. at 36. Respondent proposes $45,500.00 for pain and suffering and $314.59 in unreimbursed expenses (including $245.89 for out-of-pocket expenses, but the lesser amount of $68.70 for mileage), for a total of $45,814.59. Response at 12.

### A.  Legal Standards for Damages Awards

In several recent decisions, I have discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within the SPU. I fully adopt and hereby incorporate my prior discussion in Sections III and IV of *Leslie v. Sec'y*

*Health & Hum. Servs*., No. 18-0039V, 2021 WL 837139 (Fed. Cl. Spec. Mstr. Jan. 28, 2021) and *Johnson v. Sec'y of Health & Hum. Servs.,* No. 18-1486V, 2021 WL 836891 (Fed. Cl. Spec. Mstr. Jan. 25, 2021), as well as Sections II and III of *Tjaden v. Sec'y of Health & Hum. Servs.,* No. 19-419V, 2021 WL 837953 (Fed. Cl. Spec. Mstr. Jan. 25, 2021).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[7]

## B.  Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed, leaving only the severity and duration of the injury to be considered in making a pain and suffering award. In determining appropriate compensation for pain and suffering, I have carefully reviewed and taken into account the complete record in this case, including all medical records, affidavits, plus all filings submitted by both Petitioner and Respondent. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and relied upon my experience adjudicating these cases. However, my determination is ultimately based upon the specific circumstances of this case.

Citing four prior damages determinations (*Sherbine, Edens, Niemi, Lucchesi*),[8] Petitioner requests no less than $75,000.00 for actual pain and suffering. Mot. at 36. She asserts that the severity of her injury is comparable to, and in the "upper range" for, the awards from the aforementioned SIRVA cases. *Id.* at 30-35. In particular, Petitioner emphasizes that she underwent two formal PT sessions plus at-home exercises; received

---

[7] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[8] *Sherbine v. Sec'y of Health & Hum. Servs.,* No. 17-413V, 2020 WL 1933136, at *1 (Fed. Cl. Spec. Mstr. Mar. 27, 2020) (awarding $70,000.00 for actual pain and suffering); *Edens v. Sec'y of Health & Hum. Servs.,* No. 19-1110V, 2021 WL 2182720, at *1 (Fed. Cl. Spec. Mstr. Apr. 26, 2021) (awarding $70,000.00 for actual pain and suffering); *Niemi v. Sec'y of Health & Hum. Servs.,* No. 19-1535V, 2022 WL 3135258, at *1 (Fed. Cl. Spec. Mstr. July 5, 2022) (awarding $75,000.00 for actual pain and suffering); *Lucchesi v. Sec'y of Health & Hum. Servs.,* No. 19-943V, 2021 WL 5119145, at *1 (Fed. Cl. Spec. Mstr. Oct. 4, 2021) (awarding $75,000.00 for actual pain and suffering).

prescription gabapentin, cyclobenzaprine, and lidocaine cream; obtained several diagnostic procedures (including an x-ray, MRI – requiring a sedative due to Petitioner's claustrophobia, and EMG) and cupping treatment; and endured numerous visits to multiple medical providers, with surgery as the last recommended treatment option. *Id.* at 28-29 (citing Ex. 2 at 99, 107-08, 113, 122, 136; Ex. 6 at 1; Ex. 8 at 25; Ex. 9 at 25). She notes that her shoulder pain began within 48 hours of her vaccination and argues that it lasted for more than two years. *Id.* at 29. Specifically, relying on contemporaneous medical records, Petitioner contends that on July 31, 2020, she had "chronic pain" that was negatively impacting her sleep. *Id.* (citing Ex. 9 at 25). Petitioner further argues that her symptoms persisted through her January 11, 2021 EMG, (more than two years and three months post vaccination). Reply at 15 (citing Ex. 10 at 14-15). She also relies on her colleague's witness declaration, which states that Petitioner "was in pain for well over two years." *Id.* at 17 (citing Ex. 15 at 1).

Respondent, by contrast, submits that an award of no more than $45,500.00 is appropriate for pain and suffering. Response at 14.[9] Respondent argues that Petitioner experienced "approximately nine months of mild shoulder discomfort following vaccination." *Id.* He continues, Petitioner required "conservative treatment" and her symptoms have resolved. *Id.* at 16. More so, "there were large gaps in [P]etitioner seeking care for her shoulder although she actively sought care for other symptoms." *Id.* at 15. Respondent asserts, for instance, that between Petitioner's January 19 and August 1, 2019 visits, she sought *no* treatment for her left shoulder pain – despite being referred to an orthopedist and sent for an MRI in January 2019. *Id.* at 14 (citing Ex. 2 at 141; Ex. 3 at 13). And, from August 2019 to February 11, 2020, Petitioner's medical records likewise do not contain complaints of left shoulder pain. *Id.* at 14-15 (citing Ex. 8 at 25-30). Respondent notes Petitioner only returned to care in June 2020 after her use of crutches caused shoulder pain. *Id.* at 15 (citing Ex. 9 at 5-6). Thereafter, the records reflect an additional six-month treatment gap from July 2020 to January 2021. *Id.* (citing Ex. 9 at 25; Ex. 10 at 13-15). Respondent cites to one case (*Piccolotti*)[10] in support of his argument regarding an appropriate pain and suffering award. *Id.* at 16.

The filed record in this case establishes that Petitioner suffered a moderate SIRVA, with fairly significant pain upon onset but conservative treatment thereafter. Particularly relevant is evidence demonstrating Petitioner's report of vaccine-related pain within 41

---

[9] Respondent argues that Petitioner is not entitled to compensation in this case but contends no more than $45,500.00 is just and fair compensation for pain and suffering if the Court finds that Petitioner satisfies the legal prerequisites of entitlement.

[10] *Piccolotti v. Sec'y of Health & Hum. Servs.,* No. 20-135V, 2023 WL 3165383, at *5 (Fed. Cl. Spec. Mstr. Mar. 31, 2023) (awarding $45,000.00 for pain and suffering).

days of her vaccination, subsequent treatment with prescription medications, an x-ray, MRI (showing mild supraspinatus and subscapularis tendinosis, with bursal sided fraying of the supraspinatus tendon and a probable small partial thickness tear of the cranial fibers of the subscapularis tendon, and mild subacromial/subdeltoid bursitis), and EMG, participation in two PT sessions, a HEP, and cupping treatment. Additionally, Petitioner's medical records contain descriptions of her pain on a ten-point scale at her post-vaccination visits fairly close in time to the onset of her injury. In such records, Petitioner rated her pain at a 5/10 at rest but a 9/10 at worst with movement. Ex. 2 at 130 (from December 13, 2018). That same month, Petitioner rated her pain ranging from a 7-8/10. *See id.* (from December 17, 2018). While Petitioner's medical records do not contain similar descriptions of pain on a ten-point scale throughout her later treatment course, these earlier notations indeed support a moderately severe SIRVA within the first months of onset.

Additionally, Petitioner suffered from reduced ROM that was demonstrated on examination soon after her vaccination. While Petitioner did not exhibit reduced ROM during her first post-vaccination visit on November 14, 2018, Petitioner's physical examination revealed decreased ROM upon her second visit one month later, on December 11, 2018, and consistently thereafter. *See,* e.g., Ex. 2 at 115 (a December 11, 2018 examination revealing decreased ROM); Ex. 2 at 124 (a December 13, 2018 examination showing "abnormal" ROM); Ex. 3 at 15 (an August 1, 2019 examination wherein Petitioner exhibited decreased ROM with internal rotation but normal ROM in all other directions). The medical records thus show that Petitioner's limitations in ROM continued to an extent and there is evidence in the medical records that her restricted ROM was ongoing through *at least* August 2019.

Further, the record supports by preponderant evidence that Petitioner's treatment course and ongoing symptoms continued through February 2020 *at the latest*, or for approximately sixteen months. This is so even though Respondent correctly observes that Petitioner's medical records contain numerous gaps in treatment. Thus, following Petitioner's August 23, 2019 appointment, surgery was recommended as the next viable treatment option. Ex. 6 at 1-3. However, Petitioner did not return to treatment or complain of shoulder-related symptoms until *six months later*, on February 11, 2020, during a routine physical. Ex. 8 at 25-30. Petitioner's decision to forego care for six months following her August 2019 visit could be evidence that her injury had resolved – or at least did not require additional treatment and/or was manageable with at-home remedies. Still, Petitioner's complaints of ongoing symptoms of numbness and tingling in the left arm in February of 2020 provides *minimal* evidence that her injury (or sequelae thereof) was ongoing to some degree during this gap in treatment and up until her February 11, 2020 visit.

Subsequent treatment records, however, suggest Petitioner's injury did not persist much past February 2020, if at all. Although Petitioner alleges in her affidavit that her pain has continued for more than two years, the record shows that following her February 2020 visit (wherein no further treatment for her shoulder symptoms was prescribed), Petitioner again did not seek care for her left shoulder symptoms for another four months – until June 2020. Ex. 4; Ex. 9 at 5-6. And when Petitioner returned to care on June 29, 2020, she did so after she reportedly had been using crutches since May 2020, and the crutches admittedly "caused [her] shoulder to be in a lot of pain." Ex. 9 at 5-6. Petitioner's ability to use crutches by May 2020 signifies that her shoulder injury was manageable and not causing her significant pain by that time. The medical records thus support that any resurgence of left shoulder pain after Petitioner's February 2020 visit was likely caused and/or exacerbated by Petitioner's use of crutches. It thus appears more likely than not that Petitioner's left vaccine-related shoulder injury resolved sometime between February and May 2020.

Additionally, I must note that Petitioner's affidavit is inconsistent with her medical records in some respects. For example, Petitioner has contended that in April 2019, during the first, fairly lengthy gap in treatment apparent in Petitioner's medical records (from January to August 2019), her pain was "sharp" and was interfering with her ability to drive, wash her hair, and sleep. Ex. 4 ¶ 19. But medical records from April 2019 are silent regarding complaints of left shoulder pain – despite Petitioner contacting her PCP requesting manufacturer's information related to the subject vaccination. Ex. 2 at 146. It seems likely that if Petitioner was experiencing pain and limitations in ADLs to the extent she contends in her affidavit, she would have mentioned such ongoing symptoms to her treaters. While I do not find this inconsistency to detract from my finding regarding Petitioner's overall injury, it slightly minimizes the weight afforded to the assertions made in Petitioner's affidavit and underscores the mildness of Petitioner's injury.

Otherwise, while I credit Petitioner's assertions in her affidavit that she has continued to experience residual symptoms of her SIRVA, including pain and limited ROM, her overall recovery has been fairly good overall – a fact supported by her lack of continued formal treatment contained in the medical records. Indeed, Petitioner's assertions in her affidavit highlight that her lingering symptoms, although present, were manageable with conservative treatment without requiring her return to further formal treatment. I thus find the duration of Petitioner's SIRVA was approximately sixteen months.

The severity and duration of Petitioner's pain, although significant (at times) and fairly lengthy, is offset by the *numerous* temporal gaps in her treatment. When medical records filed for petitioners in the Program reveal comparable gaps, I weigh the reason

for the gaps against evidence of a petitioner's purported pain. Here, Petitioner's explanation for (at least one) gap in treatment is that her treaters told her there was nothing more they could do for her SIRVA. Ex. 4 ¶ 17 (discussing her January 17, 2019 visit and subsequent gap in treatment until August 2019). Petitioner's recollection and understanding of her January 17, 2019 visit is wholly inconsistent with the medical records from this visit – as Petitioner's treater prescribed medication, ordered an MRI (which Petitioner later cancelled), and referred her to an orthopedist at the conclusion of said visit. Ex. 2 at 144. More so, while Petitioner contends her physical therapist corroborated her understanding that she would not benefit from further treatment, Petitioner's therapist actually *recommended* additional treatment, but Petitioner did not return after two sessions. *Id.* at 134. I do acknowledge that at least one of Petitioner's treaters told her that a SIRVA "[h]eals on [its] own." Ex. 2 at 136 (a December 18, 2018 visit with Petitioner's PCP). However, the timing of this statement does not coincide with any of the gaps in Petitioner's treatment. Accordingly, Petitioner's explanation for the gaps in treatment in her medical records is not wholly persuasive. Instead, the decision to forego treatment heavily underscores the mildness of the injury, since it could be endured without medical assistance for periods of time.

The overall severity and duration of the injury at issue herein is distinguishable from Respondent's cited case. In *Piccolotti*, a petitioner waited *five months* before seeking care, he did not attend formal PT, and, while he treated for four years, his treatment was offset by a substantial two-year treatment gap, thus warranting a lower pain and suffering award. 2023 WL 3165383, at *5-6. While *Piccolotti* is factually similar to Petitioner's circumstances in many respects (given the gap in treatment), the severity and duration of Petitioner's injury merits a slightly higher award than that case. Petitioner sought care within 41 days of vaccination, she attended PT (albeit only two sessions), participated in a HEP, underwent cupping therapy, none of her gaps in treatment lasted a year or more, and she has proven ongoing symptomology sixteen months post vaccination. An appropriate pain and suffering award for Petitioner is thus more than what was awarded in *Piccolotti*.

The cases relied upon by Petitioner are, by contrast, more instructive – but the severity of Petitioner's injury does not quite warrant the $75,000.00 sum requested by Petitioner. For instance, Petitioner and the petitioner in *Sherbine* experienced moderate and severe pain levels, and both petitioners experienced decreased ROM. *See* 2020 WL 1933136, at *1-4, 11. However, the *Sherbine* petitioner received slightly more treatment than Petitioner – one cortisone injection and four sessions of PT – approximately double Petitioner's two PT sessions. *See id.* Still, the *Sherbine* petitioner waited longer to seek treatment and treated for a total of eight months (approximately half of Petitioner's

documented sixteen months of treatment). Thus, Petitioner should be awarded no more than the $70,000.00 awarded in *Sherbine*.

Similarly, Petitioner should be awarded no more than the $70,000.00 awarded to the *Edens* petitioner. The *Edens* petitioner sought treatment within six days of vaccination, received prescription pain medication, four cortisone injections, participated in a HEP, and treated for more than twenty-seven months (with large gaps in treatment). 2020 WL 8457671, at *5-7. While the *Edens* petitioner received four cortisone injections, she did not treat with formal PT whatsoever and, at most, *Edens* rated her pain at a 4/10. *See id.* Comparably, Petitioner declined a cortisone injection but attended PT, and she seemed to experience greater pain, as she rated her pain at a 9/10 at most. And, while *Edens* indeed received repeat cortisone injections, Petitioner underwent cupping therapy. Such facts, when weighed in each case, thus cancel each other out. The cases are similar in that they each contain gaps in treatment throughout otherwise fairly lengthy treatment courses. For these reasons, I find Petitioner thus should be awarded no more than the petitioner in *Edens.*

While Petitioner's case shares factual characteristics to the petitioner in *Niemi* (in that they each presented within forty and forty-eight days of vaccination – respectively, experienced moderate to severe pain, and treated for more than one year), *Niemi* is also distinguishable because that petitioner received objectively more treatment than Petitioner. *See* 2022 WL 3135258, at *5. *Niemi* received three cortisone injections and treated with twenty-two PT sessions. *See id.* Likewise, the petitioner in *Lucchesi* received comparatively more treatment than Petitioner, evidenced by two cortisone injections, seven PT sessions, and a barbotage procedure resulting in documented continued pain. 2021 WL 5119145, at *1-3. Petitioner should thus be awarded slightly less than the $75,000.00 awarded to the *Niemi* and *Lucchesi* petitioners.

As noted above, I have concluded that Petitioner suffered a moderately severe injury, which required limited and conservative treatment but persisted over a longer period of time with lingering symptoms. Based on review of the case evidence and in my experience, I find that $70,000.00 is an appropriate award for Petitioner's actual pain and suffering.

## C. Appropriate Compensation for Past Unreimbursed Expenses

### i. Out-of-Pocket Expenses

Petitioner requests $245.89 in out-of-pocket expenses. Respondent does not dispute the requested amount. I therefore find $245.89 to be a reasonable award for

Petitioner's past out-of-pocket expenses and award Petitioner the requested amount in full.

### ii.  Mileage

Applying the IRS business rate,[11] Petitioner requests $193.01 in medical mileage. Mot. at 35; Ex. 18. Alternatively, Respondent contends that the IRS medical mileage rate[12] ought to apply, and Petitioner should be awarded $68.70 in mileage. Response at 17. Nonetheless, Respondent does not dispute any of the visits for which Petitioner is seeking mileage reimbursement. *See id.*

In support of her position, Petitioner cites my recent decision in *Gibson*, which relied on the rationale from several cases from the late 1990s, showing other special masters have determined the IRS business rate is appropriate to use in vaccine cases when calculating travel expenses. Reply at 19 (citing *Gibson v. Sec'y of Health & Hum. Servs.,* No. 20-243V, 2022 WL 17820891, at *12 (Fed. Cl. Spec. Mstr. Oct. 5, 2022); *Williams v. Sec'y of Health & Hum. Servs.,* No. 99-2239V, 1996 WL 608455 (Fed. Cl. Spec. Mstr. Oct. 10, 1996); *Ashe-Robinson v. Sec'y of Health & Hum. Servs.,* No. 94-1096V, 1997 WL 54350 (Fed. Cl. Spec. Mstr. Jan. 23, 1997)). As the *Williams* special master explained, the greater business mileage rate "is intended to cover *all* costs of driving a car," not only the cost of gasoline and oil. *See* 1996 WL 608455, at *2. Thus, it includes the fixed costs of driving a car, including depreciation, maintenance, insurance, and repairs. *Id.*; *see also Ashe-Robinson,* 1997 WL 54350, at *2-3 (reimbursing the petitioner for the full cost of operating her personal vehicle using the greater IRS business rate but only actual costs for meals and gasoline when transported in another individual's car).

Respondent has not offered persuasive authority or legal citation supporting application of the lower IRS medical mileage rate in the Program context. Rather, Respondent merely highlights that the Internal Revenue Code *differentiates* between medical/dental expenses and business expenses. Response at 17, n.6. Respondent also has not shown that any other federal compensatory statutory frameworks apply the lower medical rate and/or follow the Code's differentiation of rates.

I have recently addressed this distinction, observing that "damages paid to claimants who have met the legal standard of proving a vaccine injury arise under the

---

[11] The IRS business mileage rate Petitioner argues should apply is as follows: $0.545 in 2018; $0.58 in 2019; and $0.575 in 2020-2021. Ex. 18 at 2.

[12] The IRS medical mileage rate Respondent argues should apply is as follows: $0.18 in 2018; $0.20 in 2019; $0.17 in 2020; and $0.16 in 2021. Response at 17.

specific terms of the Vaccine Act – not the Tax Code. And the Vaccine Act mandates that a petitioner be awarded their "actual" unreimbursable expenses." *Tappendorf v. Sec'y of Health & Hum. Servs.,* No. 20-1592V, 2024 WL 1299566 (Fed. Cl. Spec. Mstr. Feb. 23, 2024) (citing Section 15 (a)(1)(B)). Further, applying the logic in *Williams*, "each mile driven in a vehicle increases wear and tear, thereby increasing fixed costs (i.e., depreciation, repairs, etc.)." *Id.* Thus, an award of the operating costs of the vehicle alone "would not represent a petitioner's "actual" expenses incurred." *See id.* And while the Tax Code may reasonably distinguish between levels of deduction for vehicle usage, based upon whether the car was used for a business purpose or not, that same distinction "may not be proper in the context of a Vaccine Act award." *See Walter v. Sec'y of Health & Hum. Servs.,* No. 21-1461V, 2024 WL 1299576 (Fed. Cl. Spec. Mstr. Feb. 27, 2024) (finding that "[t]his seems, to some extent, to have been the thinking of the *Williams* special master[, and that a]pplication of the higher rate is ultimately consistent with the Act's language.").

Accordingly, and consistent with my own prior decisions, Petitioner's travel expenses should be reimbursed using the IRS business mileage rate employed in *Williams*, as consistently applied in the Vaccine Program. *See Kleinschmidt v. Sec'y of Health & Hum. Servs.*, No. 20-680V, 2023 WL 9119039, at *7 (Fed. Cl. Spec. Mstr. Dec. 5, 2023); *Gibson,* 2022 WL 17820891, at *12; *Tappendorf,* 2024 WL 1299566, at *4-5. I will therefore award Petitioner the amount of mileage expenses she seeks, $193.01, based upon a business mileage rate for each corresponding year, as well as the agreed amount for out-of-pocket expenses, $245.89. **I thus award the full amount Petitioner requests for her actual past unreimbursed expenses, $438.90.**

## Conclusion

**In view of the evidence of record, I find that there is preponderant evidence that Petitioner's pain was limited to her left shoulder and there is no alternate condition that would explain Petitioner's symptoms. Further, based on the evidence of record, I find that Petitioner has established a Table SIRVA and is therefore entitled to compensation.**

I also find that, for all of the reasons discussed above and based on consideration of the record as a whole, **$70,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering, plus $438.90 for past unreimbursed expenses, for a total of $70,438.90.**[13]

---

[13] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master